# SAMUEL T. YATES

*v.*

# THE PEOPLE OF THE STATE OF ILLINOIS.

1. CRIMINAL LAW—*of sending a weapon to a jury on their retirement, with which to make experiments.* A party on trial upon a charge of murder was defended on the theory that the deceased had come to his death by his own hand, by shooting with a pistol, which was found near his person. On the trial a pistol was shown to the jury and identified as one which had been sold to the prisoner, but it was not proved to be the one that was found near the deceased, and by the agency of which he undoubtedly came to his death. After the retirement of the jury, the pistol which had been shown to them on the trial was sent to them, without the knowledge of the prisoner, his counsel or the court, and they experimented with it for the

Syllabus.

purpose of judging whether, under the circumstances proven, the deceased could have shot himself with that weapon. The trial resulted in a verdict of guilty; and it was *held,* that because the pistol which had not been properly identified as the one by means of which the deceased was killed, was allowed to go to the jury without the prisoner's consent, a new trial should have been granted.

2. SAME—*of the appointment of a foreman to a grand jury—whether it must appear from the record.* It is not necessary that the record in a criminal cause should show the appointment of a foreman to the grand jury who found the indictment. The essential point is, that the record should show that a grand jury, duly qualified, returned the indictment into open court.

3. In this case, which was upon a change of venue, the record showed that on a certain day, the grand jurors, chosen, selected, empannelled and sworn in and for the county in which the indictment was found, returned into open court an indictment, which was then set out *in hæc verba,* and this record was accompanied by the original indictment upon which was indorsed, "a true bill," the indorsement being signed by one of the grand jurors as "foreman." This was sufficient.

4. SAME—*whether organization of the court must appear from the record.* Nor is it essential to the jurisdiction of the court to which the venue in a criminal cause is changed, that the record should show the organization of the court in which the indictment was found, if, by that phrase, is meant the names and presence of its various officers. All that is important for the court trying the cause to know is, that the court in which the indictment was found was in session, and its proceedings in reference to the case before the change of venue was taken.

5. TRANSCRIPT OF RECORD ON CHANGE OF VENUE—*its requisites.* Although the entry of the proceedings in the court from which a cause is removed on change of venue, may not be quite in the ordinary form, and somewhat resembling a clerk's certificate of what appears from his record, yet if the proper clerk certifies the transcript to be a full, true and perfect transcript of his records, it should be accepted as such.

WRIT OF ERROR to the Circuit Court of Franklin county; the Hon. A. D. DUFF, Judge, presiding.

The case is sufficiently stated in the opinion of the court.

Mr. T. B. TANNER and Mr. POLLOCK, for the plaintiff in error.

. Mr. T. S. CASEY, State's attorney, for the people.

Mr. JUSTICE LAWRENCE delivered the opinion of the Court:

This was an indictment against the plaintiff in error for murder, found by the grand jury of Hamilton county, and taken by change of venue to Franklin county. A verdict of guilty was rendered upon the trial, and a motion for a new trial having been overruled, the defendant below sued out a writ of error.

The evidence in the record shows substantially the following state of facts:

About the 1st of March, 1864, the plaintiff in error and one William B. Hampton, the deceased, were going home together from a mill in Hamilton county. When they left the mill, Hampton was lying on his right side in the wagon, upon some sacks of flour, and was intoxicated. The plaintiff in error was walking and drove the oxen that drew the wagon. A short time after they left the mill, the plaintiff in error came running back, and announced that Hampton had shot himself. Several persons at once went with the plaintiff in error to the wagon, where they found Hampton lying on the sacks on his right side with his right elbow under him, and dead. A pistol lay six or eight inches back of his head on the sacks. The deceased had been shot upon the apex of the head. There was blood in the wagon and there were three bloody spots on the left hand of the deceased. The plaintiff in error stated that the deceased had got the pistol from the coat-pocket in the wagon and shot himself; that he was walking by the oxen when he heard the report of a pistol, and looking back, exclaimed, "Barnett, what do you mean?"—that he immediately stopped the oxen and discovering that Hampton was dead, ran back and gave the alarm. One witness testified that he saw the plaintiff in error, while at the mill, take a pistol from the pocket of a coat and put it in the pocket of his pantaloons, and another witness identified the pistol produced upon the trial, as one

which he had sold to the plaintiff in error. Two witnesses also swore that they saw a pistol in the pocket of the deceased while at the mill. It does not appear from the record whether more than one pistol was found in the wagon. There was evidence tending to show extreme intimacy between the plaintiff in error and the wife of the deceased, and one witness testified that the prisoner had said to him, "if Hampton ever mistreated his wife on his account, he would be damned if he did'nt"—then fired off a pistol, and said to witness "do you know what that means?" It was further proven that the deceased was right-handed in every way except in the use of an axe, and that the plaintiff in error stated, when the witnesses arrived at the wagon, that the deceased "never moved hand or foot after the firing of the pistol."

The plaintiff in error proved a good character as a peaceable and quiet man, and that the deceased had remarked of himself on one occasion, that "he was of no account anyhow, and he had a notion to kill himself." The deceased and the plaintiff in error were brothers-in-law.

This was all the material evidence. In support of his motion for a new trial, the plaintiff in error filed an affidavit, in which he stated, that after the jury had retired to consider upon their verdict, and without the knowledge of himself, his counsel, or the court, a pistol was sent to them as being the same pistol with which the killing had been done, though it had not been offered in evidence and identified, and with this pistol the jury made experiments which determined their verdict, they having been, up to that time, equally divided. The statements in this affidavit do not seem to have been controverted by the people's attorney, but we find a stipulation in the record that the pistol mentioned in the affidavit was the same pistol which had been "exhibited to the jury on the trial and spoken of by the witnesses." On a careful examination of the record we find that although a pistol was exhibited to the jury on the trial, and identified by one witness as one sold by him to the plaintiff in error, yet there is not a syllable

of evidence, in the bill of exceptions, identifying the pistol in court as the one which had been found in the wagon, and by the agency of which Hampton undoubtedly came to his death. We must therefore dispose of the case as if no such evidence had been offered, and that none such had been in fact offered is indicated by the peculiar character of the stipulation, with which alone the prosecuting attorney sought to meet the statements of the affidavit. While, as a matter of fact, we may have little doubt that the pistol produced on the trial was really the same weapon found by the dead body of Hampton, yet in a case involving human life, we have no right to indulge in presumptions except such as legitimately and necessarily flow from proven facts. In this view the impropriety of sending the pistol to the jury in their retirement, and of their experimenting with it, on the theory that it was the same weapon with which the shot was fired, when there was no proof of such fact, is most manifest. The prisoner was defended upon the theory that the deceased had come to his death by his own hand. In determining that question a very important and possibly a decisive consideration, with the jury, would be the degree of difficulty Hampton would encounter, if lying on his right arm, in shooting himself in the top of his head, and the conclusion of the jury on this point might depend on the character of the wound and of the weapon with which it was inflicted. It is plain that the verdict of the jury may, as stated in the affidavit, have been found upon the hypothesis that they held in their hands the pistol by means of which Hampton came to his death, and yet this hypothesis is unsupported by proof. Because this pistol which had not been put in evidence or identified, was allowed to go to the jury without the prisoner's consent, a new trial should have been granted, and on this ground we reverse the judgment.

It is further insisted that the record sent from Hamilton to Franklin county, is defective in not showing the organization of the court or the appointment of a foreman to the grand jury. The record does show however, that at the May term,

1864, of the Circuit Court for the county of Hamilton, and on the fifth day of the term, being the 27th of May, 1864, the grand jurors chosen, selected, empanelled and sworn in and for said county returned into open court an indictment, which is then set out *in hæc verba*. The original indictment sent from Hamilton to Franklin county as required by law, is indorsed " a true bill, C. Crouch, Foreman." This record, with the accompanying indictment, is sufficient. It was not necessary the record should show the appointment of a foreman. The essential point is, that the record should show that a grand jury, duly qualified, returned the indictment into open court, and this explicitly appears. Neither is it necessary the record should show the organization of the court, if, by that phrase, is meant the names and presence of its various officers. The fact that the Circuit Court of Hamilton county was in session, and its proceedings, appear from its record as certified by its clerk under his official seal, and these facts are all that it was important for the court of Franklin county to know. It is objected that these things do not appear from a transcript of the record but from a certificate of the clerk. The entry is not quite in the ordinary form, and somewhat resembles a clerk's certificate of what appears upon his records, but the clerk of Hamilton county certifies that it is a full, true, and perfect transcript of his records, and we must accept it as such. This entry and a subsequent one showing the order for a change of venue on the application of the prisoner contained all that was necessary to give the Circuit Court of Franklin county jurisdiction.

The counsel for plaintiff in error also assign errors upon the instructions given for the people, without however, submitting any argument upon them. We have examined them and find them unobjectionable. The judgment is reversed and the cause remanded.

*Judgment reversed.*